## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JEFFREY LYNN DOWNING,

     *Plaintiff*,

*v.*                        CASE NO. 11-CV-10884

COMMISSIONER OF            DISTRICT JUDGE JULIAN ABELE COOK
SOCIAL SECURITY,         MAGISTRATE JUDGE CHARLES E. BINDER

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for Supplemental Security Income ("SSI")

_____

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

benefits. This matter is currently before this Court on cross-motions for summary judgment. (Docs. 10, 13, 14.)

Plaintiff was 46 years of age at the time of the most recent administrative hearing. (Doc. 6, Transcript at 23, 34, 109.) Plaintiff's employment history includes work as journeyman mechanic and asbestos supervisor in the construction industry for nearly twenty years. (Tr. at 135.) Plaintiff filed the instant claim on November 24, 2006, alleging that he became unable to work on September 15, 2005. (Tr. at 109.) The claim was denied at the initial administrative stages. (Tr. at 56.) In denying Plaintiff's claim, the Commissioner considered disorders of back, discogenic and degenerative, and other urinary tract disorders as possible bases for disability. (*Id.*) On March 16, 2009, Plaintiff appeared before Administrative Law Judge ("ALJ") George Gaffany, who considered the application for benefits *de novo*. (Tr. at 20-33.) In a decision dated March 31, 2009, the ALJ found that Plaintiff was not disabled. (Tr. at 33.) Plaintiff requested a review of this decision on April 17, 2009. (Tr. at 12.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on January 3, 2011, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-5.) On March 4, 2011, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

## B.    Standard of Review

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination which can be appealed first to

the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations

3

based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence

without directly addressing in his written decision every piece of evidence submitted by a party");

*Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

### C. Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the SSI program of Title XVI, 42 U.S.C. §§ 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe

5

impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D.    ALJ Findings**

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through December 31, 2011, and that Plaintiff had not engaged in substantial gainful activity since September 15, 2005, the alleged onset date. (Tr. at 25.) At step two, the ALJ found that Plaintiff's degenerative disc disease of the thoracic and lumbar spines status post fusion, status post left shoulder arthroscopic

6

subacromial decompression, and osteoarthritis status post left knee arthroscopy with debridement were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 27.) At step four, the ALJ found that Plaintiff could not perform any of his past relevant work. (Tr. at 31.) The ALJ also found that on the alleged disability onset date, Plaintiff was a younger individual age 18 to 44. (*Id.*) At step five, the ALJ found that Plaintiff could perform a limited range of sedentary work. (Tr. at 27-31.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 33.)

### E.    Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that in October 2003 Plaintiff fell from a tree stand placed 25 feet above the ground. (Tr. at 41.)

On July 27, 2005, an MRI of the thoracic spine revealed at "T7/8 and T8/9 [] small protrusions of the discs to the right of midline that cause some mild effacement of the spinal cord[,]" at "T11/12 [] some degenerative changes of the end plates with multiple posterior osteophytes [and] a moderate sized disc protrusion on the left that causes effacement of the spinal cord with displacement of the cord to the right" and "no evidence of any other disc abnormality or narrowing of the spinal cord or neural foramina." (Tr. at 331.)

On August 19, 2005, a CT of the dorsal lumbar spine revealed "degenerative spondylosis" at L1-2 and a "suspect[ed] herniated disc at T11-12 to the left of midline, which does appear to efface the thecal sac in this region." (Tr. at 228, 254.)

On December 1, 2005, Plaintiff underwent a left-sided costotransversectomy at T11-12 with discectomy, decompression, fusion, and instrumentation" by Geoffrey Thomas, M.D. (Tr. at 231, 243-53.) Another physician from Dr. Thomas's office, Douglas Gieger, M.D., worked with

Plaintiff postoperatively. On March 1, 2006, Dr. Geiger saw Plaintiff, who reported that "his radiating pain has completely resolved," so Dr. Geiger encouraged Plaintiff to continue his exercise routine, which included "walking approximately a mile a day." (Tr. at 233.) On May 4, 2006, Plaintiff was seen by Dr. Geiger for left flank pain that Dr. Geiger concluded was "of unknown etiology." (Tr. at 231.)

On May 22, 2006, Plaintiff was evaluated by Peter Bono, D.O., orthopedic spine surgeon. (Tr. at 259-65.) Dr. Bono noted that after the fusion at T11-12 was performed by Dr. Geiger, Plaintiff's "symptoms of myelopathy and the reason why he underwent surgery completely resolved," as did the "area of fullness over the left flank." (Tr. at 260.) However, he noted that "[o]ver the past month, the patient reported increased pain and numbness with sensory disturbance in the left lower aspect of the back and wrapping around to the left flank." (*Id.*) As of May 2006, Plaintiff reported that he "could stand for 30 minutes, sit for an unlimited amount of time, and walk for 20-30 minutes." (Tr. at 260.) Dr. Bono "recommended an MRI of the thoracic spine to be certain of no adjacent disc herniation above or below the fusion." (Tr. at 263.) Dr. Bono stated that "[i]f this turns out to be a normal MRI, other than postoperative findings, then a selective nerve block may be helpful in identifying and isolating the nerve root that is causing discomfort as this may appear to be a thoracic radiculopathy." (Tr. at 263.)

On May 12, 2006, and June 14, 2006, Plaintiff underwent "left renal extracorporeal shock wave lithotripsy" to address his recurrent renal calculi, i.e., kidney stones. (Tr. at 269, 271.) After the procedures, the stone fragmented and Plaintiff "tolerated the procedure well." (Tr. at 269-72.)

On June 19, 2006, Plaintiff underwent a "[t]ransforaminal epidural steroid injection at T11-T12 on the left using fluoroscopy." (Tr. at 295.) After the procedure, the "symptoms did resolve."

(*Id.*) On July 10, 2006, Plaintiff was given a "[t]ransforaminal epidural steroid injection at L1-L2 on the left." (Tr. at 296.)

On August 1, 2006, Dr. Bono noted that a recent MRI had shown "small central disc herniation at the L5-S1 level as well as enhancing soft tissue against the T11-T12 level in the paracentral location with significant mass affect on the thecal sac" and stated that "[p]rimary consideration will be that of granulation tissue" and that "[r]ecurrent disc would be a secondary consideration." (Tr. at 278, 293.) Dr. Bono also noted that Plaintiff had a "normal gait" and a "full range of motion of the lumbar spine with flexion, extension, and lateral bending, and no subjective pain," as well as "motor strength, which is 5/5 in bilateral upper and lower extremities." (Tr. at 279.) Dr. Bono recommended that Plaintiff participate in the "Functional Recovery Program" and stated that his "prognosis is hopefully good." (*Id.*)

Plaintiff underwent a bone scan on August 1, 2006, which found "[m]oderate arthritic changes, most prominently involving knees . . . [but] [o]therwise, normal bone scan . . . [with] [n]o evidence of bony metastases." (Tr. at 291.)

On October 13, 2006, Murray B. Levin, M.D., concluded, for the Asbestos Worker's Local #25, that Plaintiff was permanently disabled from his past work as an asbestos worker. (Tr. at 349.) Dr. Levin noted that Plaintiff had

> persistent pain with radiation to the lower chest and upper abdomen on the left side. The nature, which is not clear to me, may represent scar tissue, persistent, related to his surgery. It is sufficiently severe to interfere with his function as an asbestos worker and he is disabled from that activity on that basis alone.

(*Id.*)

A Residual Functional Capacity Assessment ["RFC"] completed on January 26, 2007, concluded that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and was

9

unlimited in his ability to push or pull. (Tr. at 351.) The assessment also concluded that Plaintiff should never be required to climb ladders or scaffolds, is frequently limited in his balancing abilities, and is occasionally limited in all other postural areas. (Tr. at 352.) There were no manipulative, visual, communicative, or environmental limitations established. (Tr. at 353-54.)

On June 15, 2007, an examination of Plaintiff's left shoulder was "normal." (Tr. at 459.) On July 9, 2007, Dr. Bono recommended an MRI of the lumbar spine to "eliminate a possible disc herniation at the L3-4 level" and that Plaintiff "follow-up with the pain clinic for a cortisone injection into his left upper thigh." (Tr. at 363.) On July 17, 2007, an MRI of the lumbar spine showed "[m]ild multilevel spondylosis with compromise of the right L3, left L4 and the right L5 nerve roots within their neural foramina as described above. There is also Creda 1 retrolisthesis of L5 on S1. The findings are slightly worse than the prior exam [of June 5, 2006]." (Tr. at 370.)

Plaintiff underwent an adult mental health assessment on August 16, 2007, by Marc Silverstone, Ph.D., who diagnosed Plaintiff with "Dysthymic Disorder 311.4." (Tr. at 376.) Dr. Silverstone recommended "[s]upportive counseling to address depressed mood" and recommended that "[a]ny use of Opioid medications should be monitored by his pain doctor given his elevated SOAPP Version 1.0 score of 28 and his history of Marijuana use." (*Id.*)

On October 3, 2007, Plaintiff was examined by Jeff Pierce, D.O., who noted that Plaintiff was using the following medications: "Diovan, Norvasc, Aciphex, Lyrica, Opana, Wellbutrin, Seroquel, and Vicodon." (Tr. at 384.) Dr. Pierce diagnosed Plaintiff with low back pain, "[l]eft L4 neuritis" and recommended a home exercise program, physical therapy, medications as prescribed by his medical doctor and "EMG/nerve conduction study to rule out any radiculopathy and left meralgia paresthetica." (Tr. at 386.)

10

On October 15, 2007, an EMG study was "normal" with "no electrodiagnostic evidence (EDX) of bilateral lumbosacral radiculopathy," "no EDX of bilateral peroneal neuropathy," and "no EDX of bilateral sural neuropathy." (Tr. at 388.)

Due to pain experienced in his left shoulder beginning in June 2007, Plaintiff underwent a "left shoulder Arthroscopic subacromial decompression [], AC joint resection [], [and] Arthroscopic labral repair" surgery. (Tr. at 392, 397, 410-14.) Plaintiff participated in physical therapy after surgery but was discharged when "all goals had been met." (Tr. at 402.) Ten weeks after surgery, on October 30, 2007, Plaintiff was "doing well" with a "full" range of motion and "good strength." (Tr. at 392.) Plaintiff's doctor, L. Farjo, M.D., recommended that Plaintiff "[r]eturn to activities gradually, as tolerated" and that he begin "a home exercise program." (*Id.*)

On November 28, 2007, Dr. Sripada's physician's assistant stated that Plaintiff had "no new motor or sensory deficits noted." (Tr. at 416.) Plaintiff's previous visits were for reevaluation and "medication adjustment." (Tr. at 416-32.)

Plaintiff was also treated, by his physician Nathan Bloch, D.O., for plantar fascitis and osteoarthritis in his right foot beginning in March of 2008. (Tr. at 547-51.)

On June 25, 2008, an MRI of Plaintiff's left knee revealed "[d]egenerative change in the medial compartment with cartilaginous loss, subchondral change, spur and medical meniscal tear," in addition to "[d]egenerative spurring seen laterally" and "ACL tear and PCL partial thickness and sprain." (Tr. at 521.)

On July 18, 2008, Jack Lennox, D.O. evaluated and read x-rays of Plaintiff's left knee and diagnosed Plaintiff with "grossly decreased, uneven medical joint space as well as degenerative changes to the patellofemoral articulation and loose bodies." (Tr. at 470, 472.) Therefore, on August 12, 2008, Dr. Lennox performed a left knee arthroscopic joint debridement and medial

11

meniscoplasty on Plaintiff. (Tr. at 468-71.) On August 22, 2008, Dr. Lennox re-evaluated Plaintiff and found that the "left knee looks good," so Plaintiff was sent to formal physical therapy. (Tr. at 467, 537-45.)

On January 25, 2009, Dr. Bloch placed a checkmark on a form indicating that Plaintiff was "incapable of sedentary work on a sustained time basis." (Tr. at 526.) Dr. Bloch also placed a checkmark on the line indicating that Plaintiff's pain is severe and that Plaintiff's complaints of pain are consistent with his objective medical findings. (Tr. at 527.) Dr. Bloch also concluded that Plaintiff needs "complete freedom to rest frequently without restriction." (Tr. at 528.)

Plaintiff testified at the administrative hearing that initially he did not realize the gravity of the injury so he was treated for minor back pain. (Tr. at 41.) After an MRI was taken, it revealed a crushed disc in his spinal cord. (*Id.*) When the ALJ asked him why he was able to work until September 2005, Plaintiff indicated that he had "worked as long as [his] body would allow." (Tr. at 42.) When further asked whether the discectomy and decompression fusion surgery had relieved any pain, Plaintiff responded that it "did not" and that his pain is "actually worse now." (*Id.*) Plaintiff stated that he takes "a lot of medication" including "OxyContin for the pain," "Lyrica [which] is supposed to help the nerves part of it" and Vicodin "on occasion when he needs it." (Tr. at 43.) Plaintiff also testified that he experiences side effects from the medications such as "[l]oss of memory," "grogginess," being "tired all the time," and difficulty sleeping. (*Id.*) Plaintiff also stated that his everyday level of pain was "a six or a seven"out of ten and that his highest level of pain is "[p]robably a nine," which can last for "a couple of hours and sometimes it can last all day long." (*Id.*) Plaintiff stated that he is "either reclined or laying down" most of the time and that he is "virtually always doing that." (Tr. at 44.) Plaintiff testified that despite a fifth arthroscopic surgery on his left knee in August 2008, he still experiences "instability," and that despite a left

shoulder decompression surgery, there has "not [been] a whole lot of change," other than that he can reach overhead and in front of himself but that it is painful to do so. (Tr. at 44-45, 49.)

Plaintiff testified that he can walk 100 yards, stand for 5 minutes, bend over with pain, stoop or squat, and sit for 20 minutes or so. (Tr. at 45-46.) Plaintiff stated that he could only lift 10-15 pounds. (Tr. at 46.) When the ALJ asked him whether he hunted with a crossbow, Plaintiff responded that he did go hunting a "couple times" last season for "a couple hours" at a time, and that his wife would drive him to the site and that he would "pay for it because it takes me three days to actually feel good enough to go back out and try something else." (Tr. at 47.) Plaintiff also testified that he stopped using marijuana in 2007. (*Id.*)

Andrew Murphy Steiner, M.D., certified in Physical Medicine and Rehabilitation, testified as a medical expert. (Tr. at 48.) Dr. Steiner had reviewed the medical evidence in Plaintiff's file but was not personally acquainted with Plaintiff. (*Id.*) Dr. Steiner testified that Plaintiff's impairments, singularly or in combination, do not meet a Listing, and that Plaintiff could function at the sedentary level with limitations as to occasional bending, twisting, stooping, kneeling, crawling, crouching, climbing and overhead work bilaterally. (Tr. at 50.) Dr. Steiner noted that he was not making any kind of judgment on Plaintiff's testimony as to the level of pain he suffers, but acknowledged that "his conditions can cause some pain." (Tr. at 51.) Dr. Steiner clarified that he "tried to tell the Court what I felt the residual abilities would be in spite of that pain." (*Id.*) As to side effects from medication, Dr. Steiner testified that "a loss of alertness can accompany and can be a side effect of strong pain medications." (Tr. at 51-52.)

The ALJ asked the Vocational Expert ("VE") to assume a person with Plaintiff's background who would have to

> limit lifting to 10 pounds occasionally and five frequently, stand two hours in an eight-hour workday, sit for six, walking limited to 100 yards at a time. The non-

exertional physical limits would all be occasional except I'm going to provide for no ladder climbing. So just to occasional stair climbing, balance, stoop, kneel crouch, and crawl. That's occasional as opposed to frequent or constant. Only occasional reaching bilaterally.

(Tr. at 53.) The VE testified that such a person could not perform Plaintiff's past relevant work but could perform other jobs available in the economy such as electronics or PC assembly, inspector, loader/packager, and that these jobs would all be sedentary and unskilled with a sit/stand option. (Tr. at 53-54.) The VE stated that if the same person could not maintain an eight-hour workday, there would be no jobs available. (Tr. at 54.)

### F.     Analysis and Conclusions

### 1.     Legal Standards

In order to be eligible for disability benefits, a person must become disabled during the period in which he or she has met the statutory special earnings requirements. 42 U.S.C. §§ 416(i), 423(d)(1)(A). Federal courts have therefore held that "[m]edical evidence is relevant to prove a disability only while the claimant enjoyed insured status. However, medical evidence that postdates the insured status may be, and ought to be, considered insofar as it bears on the claimant's condition prior to the expiration of insured status." *Anderson v. Comm'r of Soc. Sec.,* 440 F. Supp. 2d 696, 699 (E.D. Mich. 2006) (citing *Estep v. Weinberger*, 525 F.2d 757 (6th Cir. 1975); *Davis v. Califano*, 616 F.2d 348 (8th Cir. 1979); and *Begley v. Matthews*, 544 F.2d 1345, 1354 (6th Cir. 1976)).

The ALJ determined that during the time Plaintiff qualified for benefits, he possessed the residual functional capacity to perform a limited range of sedentary work. (Tr. at 27-31.) Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job

14

duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a)(1991). Social Security Ruling 83-10 clarifies this definition:

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

SSR 83-10.

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.   Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 10.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that: the ALJ's credibility finding is not supported by substantial evidence; that the ALJ erred by inferring that Plaintiff's desire to hunt damaged his credibility as to the extent of his back pain (Doc. 10 at 15-16, 17-18); the ALJ erred in finding that Plaintiff had returned to work after his December 2005 back surgery (Doc. 10 at 16-17); and the ALJ failed to properly give controlling weight to Plaintiff's treating physician, Dr. Bloch. (Doc. 10 at 18-22.)

### a.      Credibility Determination

Plaintiff contends that the ALJ's credibility finding is not supported by substantial evidence and that the ALJ erred by inferring that Plaintiff's desire to hunt damaged his credibility as to the extent of his back pain. (Doc. 10 at 15-16, 17-18.)

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789 at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). When weighing credibility, an ALJ may give less weight to the testimony of interested witnesses. *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) ("a trier of fact is not required to ignore incentives in resolving issues of credibility"); *Krupa v. Comm'r of Soc. Sec.*, No. 98-3070, 1999 WL 98645 at *3 (6th Cir. Feb. 11, 1999) (unpublished). However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p. In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the

alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *See id.*; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms. Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *Id.* Although a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," C.F.R. §§ 404.1528(a), 416.929(a), "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded *solely* because they are not substantiated by objective medical evidence," S.S.R. 96-7p, at *1 (emphasis added). Instead, the ALJ must consider the following factors:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

*Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); S.S.R. 96-7p, at *3. Furthermore, the consistency of the evidence, including a claimant's subjective statements, is relevant in determining a claimant's credibility. 20 C.F.R. § 404.1527(c); S.S.R. 96-7p, at *5.

After examining the record evidence, I suggest that substantial evidence supports the ALJ's finding that Plaintiff's testimony regarding his level of pain was not fully credible. The ALJ specifically considered all six factors listed above. (Tr. at 28-30.) In addition, the ALJ had the benefit of Dr. Steiner's testimony as a medical expert, upon which he relied greatly. (Tr. at 30, 48.) Dr. Steiner noted that he was not making any kind of judgment on Plaintiff's testimony as to the level of pain he suffers but acknowledged that "his conditions can cause some pain." (Tr. at 51.) Dr. Steiner clarified that he "tried to tell the Court what I felt the residual abilities would be in spite of that pain." (*Id.*) In other words, Dr. Steiner found that Plaintiff's complaints of disabling pain were not fully credible.

I suggest that the ALJ and Dr. Steiner's conclusions are supported by substantial evidence. I first note that the ALJ's decision does not appear to give weight to the fact that Plaintiff went hunting; it is mentioned, but not elaborated upon. (Tr. at 30.) I further suggest that substantial objective medical evidence and Plaintiff's reports of his own condition to his physicians support the ALJ's findings as to Plaintiff's credibility.

After his discectomy and fusion surgery, Plaintiff reported that "his radiating pain ha[d] completely resolved," so Dr. Geiger encouraged Plaintiff to continue his exercise routine that included "walking approximately a mile a day." (Tr. at 233.) Dr. Bono also noted that after the fusion surgery, Plaintiff's "symptoms of myelopathy and the reason why he underwent surgery completely resolved." (Tr. at 260.) As of May 2006, Plaintiff reported that he "could stand for 30 minutes, sit for an unlimited amount of time, and walk for 20-30 minutes." (Tr. at 260.) In August

2006, Dr. Bono also noted that Plaintiff had a "normal gait," a "full range of motion of the lumbar spine with flexion, extension, and lateral bending, and no subjective pain," as well as "motor strength, which is 5/5 in bilateral upper and lower extremities." (Tr. at 279.) Dr. Bono recommended that Plaintiff participate in the "Functional Recovery Program" and stated that Plaintiff's "prognosis is hopefully good." (*Id.*) By July 2007, Dr. Bono recommended an MRI of the lumbar spine to "eliminate a possible disc herniation at the L34 level" which was "slightly worse than the prior exam." (Tr. at 363, 370.)

In October 2007, Dr. Pierce recommended conservative treatment indicating a less than severe condition, i.e., a home exercise program, physical therapy, and  medications as prescribed by his medical doctor. (Tr. at 386.) On October 15, 2007, an EMG study was "normal" with "no electrodiagnostic evidence (EDX) of bilateral lumbosacral radiculopathy," "no EDX of bilateral peroneal neuropathy," and "no EDX of bilateral sural neuropathy." (Tr. at 388.)

Although Plaintiff had shoulder problems, after his shoulder surgery Plaintiff was discharged from physical therapy because "all goals had been met." (Tr. at 402.)  Ten weeks after surgery, on October 30, 2007, Plaintiff was "doing well," and had a "full" range of motion and "good strength." (Tr. at 392.) It was recommended that Plaintiff "[r]eturn to activities gradually, as tolerated" and that he begin "a home exercise program." (*Id.*)  On November 28, 2007, it was noted that Plaintiff had "no new motor or sensory deficits . . . ." (Tr. at 416.)

Similarly, although Plaintiff's left knee showed degenerative changes (Tr. at 521), after surgery was performed in August 2008, Dr. Lennox re-evaluated Plaintiff and found that his "left knee looks good." (Tr. at 468-72, 467, 537-45.)

I therefore suggest that the ALJ's credibility findings are supported by substantial evidence.

**b.     ALJ's Findings as to 2006 Income**

Plaintiff argues that the ALJ erred in finding that Plaintiff had returned to work after his December 2005 back surgery. (Doc. 10 at 16-17.) The ALJ expressly found that Plaintiff "worked after the alleged onset date but his work activity did not rise to the level of substantial gainful activity" since his earnings in 2006 were $9,840. (Tr. at 25.) Plaintiff notes, however, that even this amount was not wages but rather the result of a union disability claim having been approved. (Doc. 10 at 16.) I suggest that to the extent the ALJ's finding was in error, it was harmless error since the ALJ ultimately found that Plaintiff had not engaged in substantial gainful activity.

### c.   Treating Physician

Plaintiff contends that the ALJ failed to properly give controlling weight to Plaintiff's treating physician Dr. Bloch. (Doc. 10 at 18-22.) Plaintiff notes that the ALJ's main reason for rejecting the opinion was because the opinion was conclusory and not based on objective medical evidence. (Doc. 10 at 19; Tr. at 31.) In addition, the ALJ stated that the disability determination was reserved to the Commissioner. (Tr. at 31.) In his reply, Plaintiff contends that the "ALJ cannot base his opinion on his own seat-of-the-pants intuition." (Doc. 14 at 4.) I suggest that he did not.

I note at the outset that Dr. Bloch's conclusion that Plaintiff is "incapable of sedentary work on a sustained time basis" (Tr. at 526) is not entitled to controlling weight since "[i]t is well settled that the ultimate issue of disability is reserved to the Commissioner." *Kidd v. Commissioner*, 283 Fed. App'x 336, 341 (6th Cir. 2008); *Gaskin v. Commissioner*, 280 Fed. App'x 472, 475-76 (6th Cir. 2008).

The next question is whether the ALJ's decision to give this opinion less than significant weight (Tr. at 31) was made in accordance with the required findings and is supported by substantial evidence.

In weighing the opinions and medical evidence, the ALJ must consider relevant factors such as the length, nature and extent of the treating relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's evidentiary support, and its consistency with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6). Therefore, a medical opinion of an examining source is entitled to more weight than a non-examining source and a treating physician's opinion is entitled to more weight than a consultative physician who only examined the claimant one time. 20 C.F.R. § 404.1527(d)(1)-(2). *See also Rogers*, 486 F.3d at 242 (stating that the "treating physician rule," which provides that "greater deference is usually given to the opinions of treating physicians than to those of non-treating physicians," is a key governing standard in social security cases). "Moreover, when the physician is a specialist with respect to the medical condition at issue, . . . her opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

The opinion of a treating physician should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). If the ALJ declines to give controlling weight to a treating source's opinion, then he must use the following factors to determine what weight the opinion should be given: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. Where the ALJ "failed to conduct the balancing of factors to determine what weight should be accorded these treating source opinions . . . , [t]his alone constitutes error, as '[a] finding that a treating source medical opinion . . . is not entitled to

21

controlling weight [does] not [mean] that the opinion should be rejected.'" *Cole v. Comm'r of Soc. Sec.,* 652 F.3d 653, 660 (6th Cir. 2011) (quoting *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009)). This rule applies when the treating source opinion is a *medical* opinion; however, "[w]hen a treating physician instead submits an opinion on an issue reserved to the Commissioner – such as whether the claimant is 'disabled' or 'unable to work'– the opinion is not entitled to any particular weight." *Turner v. Comm'r of Soc. Sec.*, 381 Fed. App'x 488, 492-93 (6th Cir. 2011) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d), 1527(e), 416.927(e); Soc. Sec. Ruling 96-5p; and *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).

A physician qualifies as a treating source if the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." 20 C.F.R. § 404.1502. "The opinion of a non-examining physician, on the other hand, 'is entitled to little weight if it is contrary to the opinion of the claimant's treating physician.'" *Adams v. Massanari*, 55 Fed App'x 279, 284 (6th Cir. 2003) (quoting *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987)).

"Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight." S.S.R. 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792, at *4. "[A] failure to follow the procedural requirement of identifying the

reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

In the instant case, Dr. Bloch's opinion, upon which Plaintiff relies, is a form with a checkmark indicating the conclusion that Plaintiff is "incapable of sedentary work on a sustained time basis." (Tr. at 526.) I suggest that this checkmark on a form is "an opinion on an issue reserved to the Commissioner" that is "not entitled to any particular weight." *Turner,* 381 Fed. App'x at 492-93. I therefore suggest that the ALJ's stated reasons for declining to give it significant weight are sufficient to satisfy the regulations and the ALJ's decision that Dr. Bloch's opinion was inconsistent with the objective medical findings is supported by substantial evidence.

Although Plaintiff was treated by Doctors Geiger, Bono, Pierce, Lennox, and Farjo, none of the these doctors concluded that Plaintiff is unable to work nor would their notes, findings, and records support such a conclusion. As noted above, after his discectomy and fusion surgery, Dr. Geiger encouraged Plaintiff to continue his exercise routine which included "walking approximately a mile a day." (Tr. at 233.) Dr. Bono recommended that Plaintiff participate in the "Functional Recovery Program," indicating that he believed Plaintiff could become productive. (Tr. at 279.) Dr. Farjo recommended that Plaintiff "[r]eturn to activities gradually, as tolerated" and that he begin "a home exercise program." (Tr. at 384.) In addition, other than successful surgeries, all of Plaintiff's physicians recommended and utilized conservative treatments such as home exercise program, physical therapy, steroid injections, and prescription medications. (Tr. at 384, 386.)

Finally, as discussed in the credibility assessment portion of this Report, Plaintiff's condition as reported to his physicians, results of medical tests performed by Plaintiff's physicians,

23

and his physicians' recommendations all support the ALJ's decision to give less than significant weight to Dr. Bloch's conclusion that Plaintiff is unable to perform any work. (Tr. at 233, 260, 279, 363, 370, 386, 388, 392, 402, 416, 467, 521.) I therefore suggest that substantial evidence supports the ALJ's decision to rely on the medical evidence and notes of all of Plaintiff's treating physicians rather than the conclusion of Dr. Bloch.

### 3.    Conclusion

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.   <u>REVIEW</u>

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.*, 454 F.3d at 596-97.  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be concise, but commensurate in detail

with the objections, and shall address specifically, and in the same order raised, each issue

contained within the objections.

s/ Charles E Binder

CHARLES E. BINDER
Dated: November 3, 2011                      United States Magistrate Judge

**CERTIFICATION**

    I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  November 3, 2011                      By   s/Patricia T. Morris
                                               Law Clerk to Magistrate Judge Binder